Filed 8/2/22  In re A.S. CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re A.S. et al., Persons Coming Under the Juvenile Court Law. | |
| MARIN COUNTY HEALTH AND HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>D.A. et al.,<br><br>Defendants and Appellants. | A162645, A162944<br><br>(Marin County Super. Ct. Nos. JV26490, JV26491, JV26959) |

D.A. (Father) and Marie S. (Mother) appeal from juvenile court orders terminating their parental rights to their three children—A.S. and D.S. (twin boys born in 2017) and M.S. (a girl born in 2018) (the Minors). Father contends the court's decision not to apply the parental-benefit exception to termination set forth in Welfare and Institutions Code[1] section 366.26, subdivision (c)(1)(B)(i) was based on reasoning that is inconsistent with our

___

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

Supreme Court's decision in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), which was issued after the juvenile court entered its order in this case. Mother argues that, if this court reverses the termination of Father's parental rights, we must also reverse the termination of her parental rights. (See Cal. Rules of Court, rule 5.725(a)(1) [prohibiting termination of parental rights of only one parent except in limited circumstances]; *In re DeJohn B.* (2000) 84 Cal.App.4th 100, 110.) We find no reversible error and therefore will affirm.

## I. BACKGROUND

The Minors were removed from parental custody in April 2020 after the Marin County Department of Health and Human Services (the Department) filed petitions under section 300 alleging domestic violence between the parents, failure to provide for the basic needs of the children (including food, clothing, shelter, and medical treatment), and substance abuse by the parents. The two older children—the twin boys, A.S. and D.S.—were the subjects of a previous dependency proceeding from June 2017 to May 2018 (prior to their younger sister's birth) arising from allegations of parental substance abuse and failure to provide for the children's needs. In that earlier case, the parents reunified with the boys after receiving family reunification and family maintenance services.

After being removed from parental custody in the second dependency proceeding in early 2020, the Minors were placed in the same resource home where the boys had been placed for seven months during the first dependency. An amended dependency petition filed in May 2020 alleged: "[Mother and Father] maintain a chaotic household evidenced by police contacts and allegations of physical conflict between the parents. Both parents have histories of substance abuse which require assessment and treatment. The conflict and substance abuse in the home significantly

2

impede the parents' ability to meet the basic and special needs of [the Minors]. [The Minors] have physical health and developmental concerns that have been inadequately addressed and require routine professional intervention. The parents have a history of CPS involvement with their family that has not been effective in preventing the current removal. All of the above issues create a substantial risk of serious physical or emotional harm to the minors." On May 26, 2020, the court sustained the amended petition, declared the Minors to be dependents, ordered out-of-home placement, and directed that Mother and Father receive reunification services.

In a report for the November 2020 six-month review hearing, the Department recommended termination of reunification services to Mother and Father. The Department stated Mother and Father continued to have an "extremely turbulent relationship with each other." The parents were engaged in a repeating cycle involving incidents of domestic violence, the issuance of restraining orders, pledging to stay away from each other and work independently on their issues, but then reuniting within days and beginning a new cycle. While recognizing the parents loved their children, the Department stated the parents appeared to be unable to prioritize the children's needs over their own. Father had maintained his sobriety during the period of review, but his focus was attempting to maintain the volatile relationship with Mother, which distracted him from caring for his children.

The children had special developmental and health needs that required consistent management and attention. A.S. was diagnosed with Neurofibromatosis Type 1 (NF1), a genetic disorder causing the growth of tumors and other potential health complications, requiring close management including regular medical appointments. He also had developmental delays in such areas as motor skills, speech, and cognitive

development, which also necessitated frequent sessions with care providers. His twin brother D.S. also had significant developmental delays, including in speech, motor skills, and sensory processing. Although not diagnosed with NF1, he had some signs that he could have it and further evaluation was warranted. Their younger sister M.S., while generally physically healthy, also had speech and other developmental delays and had signs she could have NF1. The resource parents had provided a structured and nurturing home environment in which the children were thriving and making progress with their developmental challenges, and the resource parents ensured the children were attending their numerous "developmental, emotional, educational and physical health appointments."

Father had attended most of the possible in-person visits during the review period. One missed visit was caused by Father losing his car keys after an argument with Mother. The second missed visit occurred because Mother had a protective order protecting her from Father. Father was generally appropriate and positive at visits; Father and the children greeted each other happily, and Father brought appropriate toys, books, and on a few occasions, a music box for dancing. Father attended approximately 75 percent of the virtual visits he was offered. When he did participate, he was frequently observed to be late, distracted, and moving around during visits, although this improved marginally after the social worker consistently informed Father about these concerns. When he was focused, Father was pleasant toward the children and interacted appropriately with them.

Father participated in individual therapy and had made limited progress toward his treatment goals, addressing his past traumas and triggers for anger. His therapist noted Father's progress could be impeded by his arriving late or not being in a quiet location for the virtual appointments. Father also attended codependency meetings. The meeting secretary

4

reported that Father would share with the group when he attended, but he often arrived late and left early. Father described to the social worker several strategies he uses to manage frustration and anger, including yardwork, exercise, and meditation/praying. Father recognized that his ongoing conflict with Mother distracted from his ability to care for the children and made the family home unsafe, but he and Mother continued their cycle of splitting up and then getting back together a few days later.

On January 5, 2021, after a contested hearing, the court adopted the Department's recommendation, terminated reunification services to Mother and Father, and set a section 366.26 selection and implementation hearing for May 4, 2021 (which was later deferred to May 26, 2021, for a contested hearing).[2]

In a report submitted for the section 366.26 hearing, the Department recommended termination of Father's and Mother's parental rights and selection of adoption as the permanent plan for the three children. The report updated the court on the children's extensive medical and developmental needs and their significant progress. The report described the parents' visits with the children as appropriate and loving, with the parents playing with and encouraging the children, and the children enjoying the parents' demonstration of affection. The report noted, however, that D.S. had begun having nightmares after visits with the parents and other relatives. The resource parents were dedicated to the children, were committed to meeting their needs, and wanted to adopt them.

---

[2] Father filed a notice of intent to file a writ petition challenging the court's order setting a section 366.26 hearing. After Father's counsel filed a no issues statement, this court denied pro se petitions filed by Father. (*D.A. v. Superior Court* (Mar. 16, 2021, A161894).)

In an addendum report, the Department stated Father had visited with the children again, and the visit went well. The children were bonded with the resource parents, who were committed to meeting their needs. The Department noted the young children had spent significant portions of their lives outside the care of Mother and Father. The Department stated that, although Mother and Father clearly loved the children and enjoyed visiting them, they could not meet the children's needs. The relationship between the parents and children was friendly but not parental in nature and was not strong enough that the children would experience detriment from termination of parental rights. The relationship did not promote the children's well-being to such a degree that it would outweigh the benefit they would gain in their adoptive home.

On May 19, 2021, Father filed a section 388 petition asking the court to reinstate his reunification services, return the children to his care, or select a plan of guardianship. Father alleged he was no longer in a relationship with Mother, was a loving and devoted caregiver, and intended to care for his children, who had medical needs that might prevent them from being generally adoptable. He had started to attend ManKind, a 52-week program addressing individual accountability and reeducation. Father had attended two sessions at ManKind as of the filing date.

At a Zoom video hearing on May 26, 2021, the court heard argument on Father's section 388 petition and denied it without an evidentiary hearing.[3] The court found that, in light of Father's significant history of domestic

---

[3] Neither parent was present on Zoom when the hearing began. The court denied the parents' attorneys' request for a continuance, noting the parents had requested the hearing and were aware of it, and no reason for their absence had been provided.

6

violence and substance abuse, he had not made a prima facie showing of changed circumstances.

The court proceeded with the contested section 366.26 hearing. The Department introduced into evidence its section 366.26 report filed on April 15, 2021, and the addendum report filed on May 20, 2021. The social worker who authored the reports also testified. On direct examination by the Department's counsel, the social worker testified, consistent with the view she stated in her reports, that the children were likely to be adopted. The social worker testified that, despite the children's challenging medical issues, they have "lovely" dispositions with no outstanding behavioral issues. The children follow directives and are very loving, going to the resource parents for comfort. The social worker testified the resource parents understood the seriousness of A.S.'s diagnosis and the similar issues for the other children, and they "wholeheartedly, without hesitation, took the children in during the second removal episode, and that is really a reflection of their commitment to them, unconditional love to them."

On questioning by the Minors' counsel, the social worker testified she had not personally observed any visits by the parents because her planned attempt to do so was unsuccessful due to the parents missing the scheduled visit times. Based on having read descriptions of prior visits, the social worker testified the visits were friendly but not parental in nature. The parents had not progressed in their case plans to receive unsupervised visits or overnight visits, which would provide a context for parenting in longer durations, "for 24 hours, seven days a week, or even 24 hours." The visits involved the children greeting the parents with "hi mommy" or "hi daddy" and then quickly disengaging to play on play structures. There were no emotional disruptions when the visits ended.

7

Father joined the proceeding at about 10:30 a.m., after the court took a short break following the social worker's testimony.

A visitation supervisor who had observed visits between Father and the children in February and April 2021 testified the visits were positive, and Father was attentive and loving. The children called him "daddy." The children did not exhibit anxiety when the visits ended. On one occasion, Father was sad at the end of the visit, but he appropriately did not display his emotion to the children.

On direct examination, Father testified about his children's medical conditions and needs. He testified he has a parental relationship with his children. At park visits, the children call him "dad" or "daddy," and he supervises and protects them while playing. He tells the children he loves them. He tries to support the structure the children receive in the resource home. Father testified he had attended all of the children's IEP meetings and learned about his children's developmental needs. Father then disconnected from the proceedings; Father's counsel guessed that Father's phone had died.

After closing arguments, the court issued its ruling. The court first found the children were likely to be adopted based on their ages, dispositions, characteristics, and the existence of a family (the resource family) who was dedicated to adopting the children. The court then addressed whether the parental-benefit exception to termination of parental rights applied. For the first prong of that exception, the court found Father had established continuing regular visitation, Mother "less so."

As we discuss further below, however, the court did not find the parents' relationship with the children was sufficiently beneficial that its severance would harm the children and outweigh the benefits of adoption. The court noted factors such as the children's young ages and the amount of

time they had lived with the resource parents relative to the amount of time they had been in parental custody. Although it was clear the parents loved their children, and they had positive visits at a park, the parents had failed to show they could meet the children's needs.

The court also stated there was no evidence the children would be sad if they were adopted, and the children were not in distress at the end of visits. The parents had not shown they had a "parental relationship" with the children rather than friendship. The children were thriving in the home of the resource parents. The parents had not shown their relationship with the children would promote their well-being to such a degree as to outweigh the well-being they would gain in a new home with adoptive parents.

Father, who had rejoined the proceedings, stated his disagreement and began arguing with the court, but the court soon returned to its ruling. The court found there was clear and convincing evidence the children would be adopted. The court terminated Mother's and Father's parental rights and selected adoption as the children's permanent plan.

Father appealed the court's May 26, 2021 orders denying his section 388 petition and terminating his parental rights.[4] Mother also appealed the order terminating her parental rights.

---

[4] Although Father appealed the order denying his section 388 petition, he does not present any challenges to that order in his appellate briefs, focusing solely on the order terminating his parental rights. We will affirm the order denying the section 388 petition.

Father's notices of appeal (filed in pro. per.) also purport to challenge earlier orders entered by the juvenile court, but he acknowledges in his opening appellate brief (filed by his appellate counsel) that those orders "are long final and not subject to this appeal from the May 26, 2021 rulings."

## II. DISCUSSION

Father claims the juvenile court erred by terminating his parental rights to the Minors because it relied on improper factors to conclude the parental-benefit exception did not apply.[5]

### A. *Legal Standards*

After a juvenile court determines a child is adoptable, it must "terminate parental rights and order the child placed for adoption" unless a statutory exception applies. (§ 366.26, subd. (c)(1).) One such exception is the "parental-benefit exception," whose scope the Supreme Court recently clarified in *Caden C.* This exception applies when there is "a compelling reason for determining that termination would be detrimental to the child" because a parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) As explained in *Caden C.*, to establish the exception, a parent must demonstrate: "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631, italics omitted.) Here, the court found Father maintained regular visitation, and that element is not at issue.

Father argues, however, that reversal is required because the juvenile court relied on improper grounds in assessing the second and third elements of the exception, i.e., the nature of his relationship with the Minors and whether termination of parental rights would be detrimental to them.

*Caden C.* explained that to establish the second element, "the parent must show that the child has a substantial, positive, emotional attachment to

[5] As noted, Mother joins this claim on the basis that if we reverse the termination of Father's parental rights, we must reverse the termination of her parental rights as well.

10

the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) In evaluating this element, "the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Id.* at p. 632.) The Supreme Court emphasized that "rarely do '[p]arent-child relationships' conform to an entirely consistent pattern," and "it is not necessary—even if it were possible—to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment[,] or physical care" [the parent] provided during . . . visits.' " (*Ibid.*)

As to the third element—"whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. (§ 366.26, subd. (c)(1)(B); see § 366.26, subd. (c)(1)(D).) Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life. [Citations.] . . . [T]he effects might include emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression. Yet . . . a new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

The first two elements of the parental-benefit exception—whether the parent has maintained regular visitation and "whether the relationship is such that the child would benefit from continuing it"—involve factual determinations that we review for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) The third element, "whether termination of parental rights would be detrimental to the child," also requires "a series of factual determinations" that we review for substantial evidence. (*Id*. at p. 640.) But "the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with [the] parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid*.)

## B. *Forfeiture*

The Department contends briefly that Father forfeited his claim that the court erred in applying the parental-benefit exception because he did not expressly urge the juvenile court to apply that exception. We disagree and will reach the merits. In the juvenile court, Mother's counsel argued that the children were not adoptable and that the parental-benefit exception applied. Father's counsel argued next and focused on adoptability, while also suggesting a guardianship would be a better permanent plan than adoption, in part because with a guardianship "the kids can stay where they are and the parents can be involved." Based on these arguments, the juvenile court expressly addressed the applicability of the parental-benefit exception as to both parents. On this record, we decline to hold Father forfeited the ability to argue on appeal that the parental-benefit exception applies.

**C.** *The Juvenile Court Did Not Err or Abuse Its Discretion in Determining the Parental-benefit Exception Did Not Apply*

Father contends that, in determining the parental-benefit exception did not apply, the court relied on grounds that were disapproved by *Caden C.* We find no basis for reversal.

We first note the court correctly outlined the legal standards governing application of the parental-benefit exception. After finding Father had regularly visited the children, the court noted it was "the parents' burden to prove that there is a beneficial relationship." The court also explained it needed to "determine the importance of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and weigh against the benefit to the child for adoption." These statements accurately capture the three elements of the exception as subsequently explained by the Supreme Court. (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) And in assessing the nature of the parents' relationship with the children, the court noted the Minors are "very young" (at the time of the section 366.26 hearing, the twins, A.S. and D.S., were not yet four years old, and their younger sister, M.S., was not yet three years old); they "have lived with the resource parents about the same amount of time that they have been under the biological parents' care"; and they have significant medical and other needs. All these factors are relevant to the second element of the exception under *Caden C.* (*Id.* at p. 632.)

Finally, as to whether the children would suffer detriment from termination of parental rights (the third element of the exception), the court found there was "no evidence that the children would be sad," noting in particular there was no evidence the children were distressed at the end of

13

visits with Mother and Father.[6] And, in contrast to the paucity of evidence of detriment from termination of parental rights, the court noted the evidence of substantial benefit the children would gain from adoption by their prospective adoptive parents who have provided a loving home and are capably meeting the children's significant medical, developmental, and emotional needs, allowing them to thrive.

In light of the court's findings, as well as our obligation to view the evidence in the light most favorable to the juvenile court's order (*Caden C.*, *supra*, 11 Cal.5th at p. 640), we conclude Father has not shown the juvenile court erred in concluding the parental-benefit exception was inapplicable here. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1161 [parent challenging juvenile court's decision on parental-benefit exception has burden on appeal to affirmatively demonstrate error].)

Father does not argue there is insufficient evidence to support the court's ruling. Instead, he contends that some statements by the juvenile court suggest its ruling may have been based in part on considerations that are inconsistent with *Caden C.*, a circumstance that in Father's view requires a remand. We find Father's arguments unpersuasive and find no ground for reversal.

As Father notes, the court stated the biological parents had not been able to meet the children's daily needs, a failure that led to the termination of reunification services. The court stated: "There is positive interaction between the parents and the children at these visits. It's a park visit for an

---

[6] Contrary to Father's suggestion, the court's statements on this point were not an improper finding of " 'fault' " on the part of the parents. The court only suggested that Mother's testimony (i.e., her apparent assumption that, because she would feel sad at termination, the children would also feel sad) reflected an inability to "put the[] children's needs and feelings first."

hour at a time. That's not that hard to maintain. That is not sustained significant parenting which these parents have not been able to sustain, the children as I indicated have been removed twice, and the children's needs. So we do know that these children have needs, they have every day needs such as stability, predictability, medical care, nourishment, and toilet training, and those needs were not being met by these parents, and the parents failed to show that they could meet those needs, that's why we had a ruling on January 5th [terminating reunification services]."

As *Caden C.* noted, when a section 366.26 hearing is held, it is because the biological parent has not successfully reunified with his children. (*Caden C., supra*, 11 Cal.5th at p. 637.) Accordingly, the failure to reunify, in itself, does not preclude applicability of the parental-benefit exception (although the issues that led to the dependency may still be relevant in assessing the nature of the relationship and whether the children would be harmed by termination of parental rights). (*Ibid.*) But we disagree with Father's suggestion that the juvenile court's discussion of the children's needs here runs afoul of *Caden C.*

As noted above, *Caden C.* itself emphasized that, in evaluating the nature of the child's relationship with the parent, a relevant consideration is " 'the child's particular needs.' " (*Caden C., supra*, 11 Cal.5th at p. 632.) The court did not err by considering that factor here. Indeed, as we read the court's comments on this point (and its related statements about the care the children have received from the resource parents), the court was expressing a conclusion that, in light of these young children's significant medical needs, any detriment caused by terminating their friendly relationship with Mother and Father was outweighed by the substantial benefits of adoption by the resource parents. That appropriate weighing process remains at the heart of the parental-benefit analysis under *Caden C.* (*Id.* at pp. 633–634.)

15

Similarly, the court's references to the need for a parent to show he has "a parent/child relationship" with his children provides no basis for reversal. The court stated: "[The exception] require[s] a parent to show that they have a parent/child relationship rather than friendship, and father noted that the kids were excited to see him and that they called him 'dad' or 'daddy', that's wonderful, but that does not connote a parental relationship. And the relationship must promote the wellbeing of the child to such a degree as to outweigh the wellbeing the child would gain in a permanent home with new adoptive parents. Again, that's the *Autumn H.* case. [¶] Here we have these perspective [*sic*] adoptive parents providing a home for these children in which the children have thrived and made developmental leaps, their medical condition has improved, their speech, their emotional stability, so I do not find that the parents have met their burden of establishing a parental bond exception."

As Father notes, the court in *In re L.A.-O.* pointed out the ambiguity that can arise when a juvenile court requires that a parent occupy a "parental role" in the child's life as a prerequisite to application of the parental-benefit exception. (*In re L.A.-O.* (2021) 73 Cal.App.5th 197, 210 (*L.A.-O.*).) The phrase "can mean being the person whom the child regards as his or her parent (or at least as more his or her parent than any other caregiver)," but "the parental-benefit exception does not require that the parent be the child's primary attachment." (*Ibid.*; see *In re J.D.* (2021) 70 Cal.App.5th 833, 865.) The phrase "can mean being a *good* parent—nurturing, supporting, and guiding," but under *Caden C.* a parent need not "have overcome the struggles that led to the dependency" or "be capable of resuming custody" for the exception to apply. (*L.A.-O., supra*, at p. 210.) And finally, although the phrase "can also mean giving parental care, such as changing diapers, providing toys and food, and helping with homework," this interpretation

may conflict "with *Caden C.*'s warning that 'rarely do "[p]arent-child relationships" conform to an entirely consistent pattern.' " (*Ibid*.; see *J.D.*, at p. 865.)

But in our view, any ambiguity arising from some of the terminology used by the court here provides no basis for reversal. As in *L.A.-O.*, when the court here stated it was necessary for Mother and Father to have a "parental" relationship with the Minors and referred to the care being provided by the foster parents, the court "may have meant that the children had a substantial, positive, emotional attachment to the prospective adoptive parents but not to the parents," an analysis that "would be legally correct." (*L.A.-O., supra*, 73 Cal.5th at p. 211.) And even if the court's comments could be construed to mean the parents "were not capable of taking custody, or had not been good parents, or had not been providing necessary parental care" (*L.A.-O.*, at p. 212), we do not think the court's brief discussion of whether Father had a "parental" relationship with the children provides a basis for reversal here.

Viewed in the context of the overall balancing analysis required under section 366.26, subdivision (c)(1)(B)(i) and *Caden C.*, we do not think the arguably ambiguous terminology used by the court made a difference to the outcome here. In light of the children's young ages and the short amount of time they had spent in parental custody, as well as the presence of resource parents who want to adopt them and have proven capable of meeting their significant needs, it is difficult to imagine that any detriment from terminating the children's relationship with Mother and Father (whatever the nuances in how that relationship is described) could outweigh the benefits of adoption on this record. (*Caden C., supra,* 11 Cal.5th at pp. 631, 633.)

Father's remaining arguments are unpersuasive. Father asserts the court improperly "relied on considerations of future contact" between the children and the parents in declining to apply the parental-benefit exception. As noted, *Caden C.* stated that, in applying the exception, a juvenile court "must assume that terminating parental rights terminates the relationship." (*Caden C., supra*, 11 Cal.5th at p. 633.) But here, the court's brief comments about possible future visitation through the Consortium for Children came *after* it had made its ruling that the parental-benefit exception did not apply and *after* it had terminated parental rights. Father has not shown error.

Father also suggests the court "relied on inappropriate considerations in not ordering a plan of legal guardianship" for the children. He cites the court's statements at the section 366.26 hearing, in response to a specific argument made by Father's counsel, about whether the resource parents would be able to "lean on" the parents if a guardianship were ordered. But as the Department notes, the court properly began (and ended) its analysis by considering the permanent plan of adoption with termination of parental rights, in accordance with the legislatively mandated preference (§ 366.26, subd. (b)(1)); because the children were adoptable and no exception to termination applied, the court properly adopted that plan. The court was not required to first rule out guardianship, and it did not do so. The court's brief response to Father's counsel's argument about the potential merits of a guardianship was not error.

Father next takes issue with certain aspects of the testimony provided by the Department social worker at the section 366.26 hearing, including the social worker's alleged consideration of factors that are inconsistent with *Caden C.* Father asserts the court "adopted" these allegedly improper criteria. We have concluded above that *the court's* ruling (and the explanation it provided) reflect an appropriate exercise of discretion. We will

18

not assume, as Father appears to do, that the court adopted all details of the social worker's testimony. In any event, for the reasons explained above in our discussion of the court's ruling, the social worker's testimony about such matters as whether the parents had met the children's needs or whether Father had a parental relationship with the children provides no basis for reversal on this record.

Finally, Father argues the court erred by allowing the social worker to testify (during questioning by the Minors' counsel) about the nature of the parents' relationship with the children based in part on her review of reports of visits she had not personally observed. (As noted, the social worker's attempts to observe visits were unsuccessful because the parents missed the scheduled visit times.) Again, we find no reversible error. On appeal, Father contends that the testimony at issue was provided over a hearsay objection by the parents and constituted improper expert testimony, but no objections on those grounds were asserted at the hearing, so they are forfeited. (Evid. Code, § 353, subd. (a).) There is also no indication the social worker was testifying as an expert.

The parents' attorneys did object to a few of the social worker's specific answers on grounds of "lack of foundation and no personal knowledge," an objection the court overruled, stating it believed the social worker could review the records and answer questions. The court also noted the visitation supervisor, who had observed visits, was present and available for cross-examination. We agree with the Department that these few challenged answers do not provide a basis for reversal. In addition to the social worker's testimony, the court had before it the Department's reports and the visitation supervisor's testimony, both of which addressed the visits. Father, whose burden it was to prove the applicability of the parental-benefit exception, could have offered visitation records or other evidence that he believed might

19

be helpful to his position.  Finally, the juvenile court understood the social worker's testimony was based in part on her review of records, and there is no indication the court failed to weigh the evidence accordingly.

## III. DISPOSITION

The May 26, 2021 order denying Father's section 388 petition is affirmed.  The May 26, 2021 order terminating Father's and Mother's parental rights is affirmed.

_____
Streeter, J.

WE CONCUR:


_____
Pollak, P.J.


_____
Brown, J.

*In re A.S. et al.  A162645, A162944*

21